FILED
AUG 0 8 2008

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 08-40029 |
| Plaintiff, | * | |
| vs. | * | **REPORT AND RECOMMENDATION** (Motions to Suppress Evidence and Statements, Docs. 38 and 70) |
| JUAN MANUEL CARRASCO-RUIZ and PEDRO SALAZAR- SALAZAR, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending are Defendants' Motions to Suppress Evidence and Statements (Docs. 38 and 70). A hearing was held on the motions on Monday, August 1, 2008. Defendants were personally present and represented by their counsel of record, Michael Black (for Mr. Salazar-Salazar) and Mr. Jose Mendoza and Steve Nesson for Mr. Carrasco-Ruiz. The Government was represented by Assistant United States Attorney John Haak and Intern Sara Show. Two witnesses testified at the hearing: South Dakota Highway Patrol Trooper Zac Bader and Drug Enforcement Administration Special Agent Gary Harvison. Four exhibits were received into evidence.

Based on careful consideration of the evidence produced at the hearings and the parties' written submissions the Court makes the following:

### RECOMMENDATION

It is respectfully recommended that Defendant Salazar's Motion to Suppress (Doc. 38) be GRANTED in part and DENIED in part and that Defendant Carrasco's Motion (Doc. 70) be DENIED.

### JURISDICTION

Defendants are charged in an Indictment with Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1). The pending Motions were referred

to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated November 29, 2006.

## FACTUAL BACKGROUND

South Dakota Highway Patrol Officer Zac Bader and his drug dog Robby[1] were on stationary patrol on September February 21, 2008 at approximately 7:30 a.m. on Interstate 90 near exit 263 near Chamberlain. TR 15-16; EX 1 at 7:30. While on duty that day, Bader observed a pickup traveling eastbound on the interstate. The pickup did not have a front license plate. TR 24. Bader observed the pickup cross the fog line. TR 32. He decided to follow the pickup. Bader followed the pickup for a mile or mile and a half. TR 33. When he got close enough, he observed that the rear license plate was from Arizona. Bader knew Arizona did not require front license plates, so he no longer considered the lack of a front license plate as a potential traffic violation. TR 33. While following the pickup, Bader observed it cross the fog line again, and also observed it cross the center line. TR 34. Based on these traffic violations, Bader decided to initiate a traffic stop.

Trooper Bader activated the camcorder inside his patrol car. TR 15. A copy of the DVD recording was marked as EX 1 and received into evidence at the suppression hearing. No traffic violations were recorded on the recording. TR 28. The pickup stopped at the side of the interstate. Trooper Bader approached the pickup on the passenger's side. He observed two males in the pickup. TR 16. Mr. Salazar was the driver, but the passenger (Mr. Carrasco) owned the truck. TR 17-18. Bader observed trash in the vehicle, giving it a "lived in" look, air fresheners, religious paraphernalia, two bags, and a single key in the ignition. **TR 17. As he approached he also** observed a stroller and a child seat in the bed of the pickup. TR 16.

Bader asked Mr. Salazar to get into the patrol car, and Mr. Salazar complied. EX 1 at 7:31. Mr. Salazar produced a Mexican driver's license. TR 25. Bader asked Mr. Salazar where he was

---

[1] Robby and Officer Bader became certified as a drug detection team in January, 2007. TR 6. They were re-certified in 2008 through the South Dakota Highway Patrol. His certification was current on February 21, 2008.

going and where he was coming from. EX 1 at 7:31. Mr. Salazar said he was coming from Arizona and going to Minnesota. *Id.* Salazar said he was going to see a cousin in Minnesota. *Id.* He did clarify the person was related to the passenger, Mr. Carrasco. Bader explained the reason for the traffic stop, and asked Mr. Salazar if he had been drinking or if he was excessively tired. EX 1 at 7:32. Salazar expressed some difficulty in explaining in English how he was related to the person he was going to see. Bader continued to question Salazar about the route Salazar and Carrasco had taken from Phoenix, Salazar's work, where Salazar lived, and whether Salazar had a driver's license. Salazar had an Arizona identification card, but not a driver's license. Salazar explained that he had a Mexican driver's license but not one from United States. TR 39-40. EX 1 at 7:34. Bader also inquired about Salazar's relationship to the passenger. Salazar explained that their mothers were cousins. EX 1 at 7:35. Salazar could not name the person he was going to see in Minnesota. He said it was Carrasco's sister, but he had never been to visit her before. Salazar explained that Carrasco did have a driver's license. EX 1 at 7:36

Bader explained that he began to fill out a warning ticket while Mr. Salazar was in the patrol car. TR 42. Bader exited the patrol car, leaving Mr. Salazar in the patrol car. Bader returned to the pickup to speak with the passenger, Mr. Carrasco. EX 1 at 7:37. Bader's conversation with Carrasco cannot be heard on the video, but it lasts about one minute. Carrasco owned the pickup and produced an Arizona driver's license. TR 28. Bader explained that he needed to confirm that Carrasco had a valid driver's license because Salazar did not. TR 45-46.

Bader finished writing the warning ticket shortly before he exited the patrol car to return to the pickup to speak with Mr. Carrasco about driving the pickup, but Bader did not physically give the ticket to Salazar at that time. Rather, Bader opined that Salazar probably never received the warning ticket until Bader placed it in Salazar's personal property at the Brule County Jail. TR 44. Bader testified he did not give the ticket to Salazar before he went to speak with Carrasco because he had not yet confirmed that Carrasco was a licensed driver. TR 45-46.

Mr. Carrasco told Trooper Bader the two men were traveling to Minnesota to visit Carrasco's wife and children. TR 17-18. Bader returned to the patrol car after his conversation with Mr. Carrasco and again spoke with Salazar. TR 18. Bader did not give the ticket to Salazar because by then, Bader had decided to deploy Robby. TR 46. When he returned to the patrol car, Bader questioned Salazar about the presence of illegal drugs in the vehicle. TR 18.

When Bader asked if drugs were present in the truck, Salazar denied drugs were present in the truck. TR 18. EX 1 at 7:39-7:40. Bader asked Salazar if it was ok to run Robby around the truck, and Salazar indicated in an affirmative manner.[2] Bader testified that he would have run Robby around the truck even in the absence of consent. TR 18. Bader ran Robby around the truck at 7:40 a.m., ten minutes after he initiated the traffic stop. Robby indicated to the odor of drugs on the front driver's side near the fender well. EX 1 at 7:40. Robby indicated by sitting down in front of the fender by the driver's side door. *Id.* Bader advised both Salazar and Carrasco that Robby indicated to the odor of drugs, and that they would be detained while the truck was searched. TR 19. Both men sat in another trooper's patrol car during the search. *Id.*

While Bader waited for other law enforcement officers to arrive, he called dispatch at 7:46 to request information and an "EPIC check"[3] from the information on Salazar and Carrasco's identification cards/driver's licenses. Bader can be heard on EX 1 requesting information from dispatch regarding both men's information and specifying both were from Arizona. EX 1 at 7:47. Dispatch called back at 7:59 and reported that the EPIC check was negative. Pedro was "suspended"

---

[2] On the video, Salazar can be heard during the conversation about whether there are any illegal drugs in the pickup. He said "you can do it." When Bader directly asks permission to run Robby around the truck, Salazar said, "o.k."

[3] EPIC is an acronym for the El Paso Intelligence Center. It is a centralized database which contains information from several federal agencies including the DEA, Department of Homeland Security, Customs and Border Protection, Immigration & Customs Enforcement, the U.S. Coast Guard, FBI, Bureau of Alcohol, Tobacco, Firearms and Explosives, the U.S. Secret Service, U.S. Marshals Service, National Drug Intelligence Center, IRS, U.S. Department of Interior, National Geospatial Intelligence Center, U.S. Department of Defense, to name a few. *See,* www.usdoj.gov/dea/programs/epicp.htm

and she could not find any information about Juan.[4]

The officers searched the pickup and found suspicious bolts and weatherstripping in the front fender well which was not factory issued. TR 20. No drugs were found in the vehicle while it was parked on the side of the interstate. Bader expressed his intent to tow the vehicle to the nearby Department of Transportation garage for a more thorough search. EX 1 at 7:45. Ultimately, drugs were found in a hidden compartment. TR 19. Mr. Salazar and Mr. Carrasco were arrested and transported to the Brule County Jail. Mr. Salazar gave a statement which is in evidence as EX 2.

Bader employed the assistance of DEA Special Agent Gary Harvison and DCI Agent Jason Piercy to interview Mr. Salazar at the Brule County Jail.[5] TR 49. An audio tape of the interview was received into evidence as EX 2. The agents interviewed Mr. Salazar for approximately three minutes before they advised him of his *Miranda* rights. TR 52-53. The questions they asked were mostly general, such as how much English he understood, whether he understood why he was there, where he came from, etc. but a few questions were potentially incriminating, such as whether he had been paid any money to do the driving. EX 2. Three minutes into the tape, Special Agent Harvison informs Salazar he is under arrest and reads the *Miranda* warnings in English. EX 2, TR 52-53. When Harvison asks Salazar if he understands, Salazar gives a response which indicates he understands some, but not all of the warning. TR 51, EX 2 at 3:34. Harvison then asks Salazar if he can read Spanish, and Salazar responds affirmatively. *Id.* at 3:41. Harvison asks Salazar to read the *Miranda* warning (a Spanish version) to himself. Harvison asks Salazar if he understands, and

---

[4]On cross-examination, there was some discussion about whether Salazar presented Bader with an Arizona driver's license or an Arizona identification card. Bader could not recall which Salazar had, but he did recall Salazar had a Mexican driver's license. Bader can be heard on EX 1 however, calling Arizona information in to the dispatch operator for both Salazar and Carrasco. Dispatch calls back and informs Bader that Salazar's license is "suspended" so it makes sense that the Arizona card Salazar presented was an identification card rather than a driver's license.

[5]Salazar moves to suppress his statements based on the assertion that they are (1) fruit of the illegal stop; and (2) obtained in violation of the Fifth Amendment because they were involuntary. Carrasco moved to suppress his statements based solely on the basis that they were fruit of the illegal stop. Salazar joined Carrasco's motion to suppress.

Salazar says "yes." EX 2 at 4:32. Harvison asks if the agents can ask him some questions, and Salazar says "yes." *Id.* at 5:03. The interview then proceeds in English. While it is apparent English is not Mr. Salazar's first language, the men are able to communicate and the interview lasts approximately thirty minutes.

Harvison did not believe it was difficult to communicate with Salazar. He based his belief on the fact that Salazar answered his questions appropriately. After approximately thirty minutes, Harvison contacted ICE Agent Tracy Warner. Warner spoke (in Spanish) to Salazar on the phone **for approximately eleven minutes, then Harvison spoke to Warner about what Salazar told** Warner. Warner recited to Harvison the same version of events that Salazar had previously told Harvison. EX 2 at 45:05. After Salazar's conversation with Warner, Harvison and Piercy talked with Salazar for nine more minutes. The interview concluded when Salazar persisted in refusing to admit full knowledge of the presence of the drugs in the truck. EX 2 at 54:45.

Harvison interviewed Carrasco with the assistance of ICE Agent Tracy Warner. Harvison testified that Carrasco was not going to speak English with him. Harvison would not speculate whether Carrasco was able to understand or speak English.

## DISCUSSION

**Burden of Proof**

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, *United States v. Phillips*, 540 F.2d 319 (8th Cir.1976) but on the government to justify a warrantless search or seizure. *United States v. Bruton*, 647 F.2d 818 (8th Cir.1981). The standard of proof is a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The Government bears the burden of proving by a preponderance of the evidence that Miranda warnings were either not necessary or that they were given and effectively waived. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *United States v. Short*, 790 F.2d 464, 467-68 (6th Cir. 1986); *United States v. Charbonneau*, 979 F.Supp. 1177, 1181 (S.D. Ohio 1997). "It is settled that the burden is on the defendant to establish that the

evidence was unlawfully obtained. The government's only burden in admitting a confession into evidence is to show by a preponderance of the evidence that the confession was given voluntarily." *United States v. Guerrero-Herrera*, 590 F.2d 238, 242 (7th Cir. 1978)(citations omitted). *See also, United States v. Bad Hand*, 926 F.Supp. 891, 899 (D.S.D. 1996).

1.  **Motions to Suppress Evidence**
    **The Validity of the Traffic Stop**

    Defendants argued the initial traffic stop was pretextual and without probable cause. While the traffic violation was not documented on the DVD, Bader testified that when he first observed the vehicle it crossed the fog line. After Bader began following the vehicle, it crossed the fog line and the center line. Defendants do not assert otherwise. SDCL § 36-26-6 provides:

    > 32-26-6. Lane driving required–Changing lanes–Violation as a misdemeanor. On a roadway divided into lanes, a vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from such lane until the driver has first ascertained that such movement can be made with safety. A violation of this section is a Class 2 misdemeanor.

    It is well settled that "when an officer observes a traffic offense–however minor–he has probable cause to stop a vehicle." *United States v. Eldridge*, 984 F.2d 943, 947 (8th Cir. 1993) (internal punctuation and citations omitted). Pretextual traffic stops, however, violate the Fourth Amendment prohibition against unreasonable searches and seizures. *Id.* To determine whether a traffic stop is pretextual versus supported by probable cause, a court must assess the officer's action in light of the facts and circumstances known at the time of the stop. *Id.* However, "[c]ourts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001)(citation omitted). "So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop." *United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995) (citations omitted). "In other words, so long as police have probable cause to believe that a traffic violation has occurred, the stop is valid *even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot*." *United States v. Caldwell*, 97 F.3d 1063, 1067 (8th Cir. 1996)(citations omitted) (emphasis added).

The Eighth Circuit has recognized that in South Dakota, crossing the fog line is a violation of SDCL 32-26-6. *United States v. Herrrera-Martinez*, 354 F.3d 932 (8th Cir. 2004) *vacated on other grounds,* 127 S.Ct. 1125, 166 L.Ed.2d 889 (2007).[6]   **There was, therefore, probable cause** for the traffic stop.

In their briefs, however, Defendants assert they were the victims of "racial profiling." In *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.E.d2d 89 (1996) the United States Supreme Court made clear that the actual motivation of the individual officer involved has no bearing on the constitutional reasonableness of traffic stops. *Id.*, 517 U.S. at 813, 116 S.Ct. at 1774. The *Whren* Court also noted, however, that "the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.,* 517 U.S. at 813, 116 S.Ct. at 1774. One court has noted that *Whren* left unclear whether suppression is the appropriate remedy should an Equal Protection violation be shown. *United States v. Garcia,* 1999 WL 318363 (D. Kan. 1999). Another has taken the position that suppression is the appropriate remedy. *United States v. Hartwell*, 67 F.Supp.2d 784 (E.D. Mich. 1999). However, that issue need not be reached here, because "[t]o establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996). The Defendants have offered no evidence in support of their racial profiling claim. There was no testimony elicited during the hearing about whether Bader could even discern the Defendants' race before he decided to initiate the traffic stop. That Bader knew the vehicle did not have a front license plate and was probably not from South Dakota falls far short of a showing that "similarly situated individuals of

---

[6]Touching the fog or center line is not a violation if the movement can be made with safety. SDCL 32-26-6. Here the vehicle touched the fog line and the center line within a distance of travel which could have suggested the driver was tired or otherwise impaired. It appears that touching the fog line or center line may be a replacement reason for the now repealed "dangling object" traffic stops.

a different race" were not stopped for crossing the fog line.⁷

### The Scope of the Traffic Stop

"First, a police officer who personally observes a traffic violation has probable cause to stop the vehicle and offending driver . . . Second, having made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *United States v. $404,905 in U.S. Currency*, 182 F.3d 643, 646 (8ᵗʰ Cir. 1999). The officer is entitled to "undertake similar questioning of the vehicle's occupants to verify the information provided by the driver . . . if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Gregory*, 302 F.3d 805, 809 (8ᵗʰ Cir. 2002) (citations and internal punctuation omitted).

Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by examining the totality of the circumstances, in light of the officer's experience. *U.S. v. Morgan*, 270 F.3d 625, 630 (8ᵗʰ Cir. 2001). "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed in total." *Id.* at 631 (citations omitted). In *Morgan* the factors articulated by the trooper (who had eleven years of experience, seven as a drug dog handler) were: the intense smell of smoke, perfume and air freshener, extreme nervousness by the driver and passenger exhibited by avoidance of eye contact, an itinerary which included drug source and demand states, large duffel

---

⁷The Court does take interest in the short portion of another traffic stop which was inadvertently left on the end of EX 1. It involves a female, in-state driver. Trooper Bader issued her a warning ticket for following too closely but did not instruct her to join him in his patrol car for the "routine" traffic stop questions. He told her to stay in her vehicle while he wrote out the warning ticket.

bags which appeared to contain square objects, and divergent stories regarding travel plans. The Court held that the totality of the circumstances, including the officer's training and experience in detecting contraband, were sufficient to constitute reasonable suspicion to expand the scope of the traffic stop. *Id.* at 631.

More importantly, however, "even if the facts had not been sufficient for reasonable suspicion . . . a short detention for a dog sniff would not violate the Fourth Amendment. Here, the dog was at the scene from the beginning, and it only took a short time to walk the dog over to the van where it alerted to the presence of drugs." [8] *Morgan,* 270 F.3d at 631. In this case, Robby was on the scene from the beginning and Trooper Bader ran Robby around the truck ten minutes after it stopped on the side of the interstate (Robby alerted ten minutes after Trooper Bader first made contact with Mr. Salazar). Bader had finished writing the ticket when Robby came out, but Bader had not finished the traffic stop because he had not yet confirmed whether either Salazar or Carrasco had a valid driver's license, or even finished any of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history.[9] Bader was entitled to ask Salazar and Carrasco their destination, the purpose of their trip, and whether he could search their vehicle, and he was entitled to act on whatever information was volunteered. *United States v. $404,905 in U.S. Currency,* 182 F.3d 643, 646 (8th Cir. 1999); *United States v. Gregory,* 302 F.3d 805, 809 (8th Cir. 2002). Before Bader called dispatch to check the validity of Carrasco's driver's license, he deployed the drug dog.

The United States Supreme Court has held that no reasonable articulable suspicion is required to justify the use of a drug dog to sniff a vehicle during a legitimate traffic stop. *Illinois v. Caballes,* 125 S.Ct. 834 (2005). "The use of a well-trained narcotics detection dog —one that does

---

[8]This is not to suggest that the law has reached the place where everyone can be detained for a while for the purpose of conducting a dog sniff following every traffic stop.

[9]Salazar told Bader he had a valid Mexican license, but not a valid U.S. license. Carrasco told Bader he had a valid license, but Bader had not yet called dispatch to confirm it.

not expose non-contraband items that would otherwise remain hidden from public view during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of constitutionally cognizable infringement." *Id.* at 838. Pursuant to the law of the Eighth Circuit and the United States Supreme Court, the traffic stop was not impermissibly extended in this case when, ten minutes after it began and before Trooper Bader had finished his routine ministerial tasks, Robby got out of the patrol car and ran around the truck to sniff for drugs.

Whether a particular detention is reasonable in length "is a fact intensive question, and there is no *per se* time limit on all traffic stops. When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine." *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007).

Even assuming Trooper Bader did not have reasonable suspicion the Eighth Circuit stated that "mere police questioning does not constitute a seizure." *Olivera- Mendez, Id.* at 510. In *Olivera-Mendez*, the Court reiterated that questioning on a matter unrelated to the purpose of the detention does not constitute a discrete Fourth Amendment event. *Id.* In *Olivera -Mendez*, the Court noted the Trooper had probable cause to believe a speeding violation had occurred, and "we do not think [he] effected an unreasonable seizure simply by asking three brief questions related to possible drug trafficking amidst his other traffic related inquiries and tasks." *Id.* at 511. The same can be said for Trooper Bader's off-topic questions in this case.[10]

---

[10]The *Olivera-Mendez* Court also noted that assuming for the sake of argument that it was unreasonable for the Trooper to extend the stop unless he had reasonable suspicion, the evidence should nonetheless not be suppressed because the questions were not the but-for cause of obtaining the evidence. The Court reasoned, the questions were fruitless in that case, and the dog sniff (which provided probable cause for the search) would have occurred anyway while Koltz ran the driver's license checks. In this case, the questions were likewise fruitless. It is clear in this case as it was in *Olivera-Mendez,* that Trooper Bader had other tasks to complete while the drug dog sniffed the vehicle. **Trooper Bader also explicitly testified that while he had finished**

Trooper Bader did not impermissibly extend the traffic stop. The truck came to a stop at the side of the road at 7:30 a.m.. At 7:31 a.m. Mr. Salazar accompanied Trooper Bader to the patrol car, where Bader asked the routine, acceptable questions regarding the purpose and destination of the trip. Robby the drug dog ran around the vehicle at 7:40 a.m. Robby alerted at 7:40–nine minutes after Trooper Bader's first contact with the driver, and before Bader had contacted dispatch to verify that anyone in the vehicle had a valid driver's license. Pursuant to *Olivera-Mendez* no unreasonable seizure occurred here.[11] Defendant's Motion to Suppress evidence should be denied.

2.  **Motion to Suppress Statements**

Both Defendants have moved to suppress their statements based on the theory that they are the fruit of the poisonous tree. Because there was probable cause for the traffic stop and no unreasonable seizure followed the stop, the motion to suppress statements cannot be granted on that ground.

Mr. Salazar also moves to suppress all statements made to law enforcement officers on February 21, 2008. Mr. Salazar asserts that he was in custody during all questioning and that he

---

writing the ticket before Robby came out, he had not yet given it to Salazar because he had not yet confirmed whether either Salazar or Carrasco had a valid driver's license. Likewise, the few off-topic questions he asked about whether there were any drugs in the truck, where Salazar worked, what route they had driven from Arizona, etc. yielded nothing of significance.

[11]It is noted that the Eighth Circuit has instructed that even if an unconstitutional detention occurs, the evidence is not suppressible unless it is the "but-for" cause of obtaining the evidence. *United States v. Peralez*, 526 F.3d 1115, 1121-22 (8th Cir. 2008). In *Peralez*, as in this case, the drug dog was present on the scene from the beginning and the Trooper testified he would have run the dog around the vehicle regardless of the responses he received to his expanded inquiries. In *Peralez*, the dog sniff occurred after sixteen minutes and in the absence of any reasonable suspicion. The Eighth Circuit acknowledged the Trooper violated the Fourth Amendment by unreasonably extending the traffic stop, but held that the evidence was admissible because the Fourth Amendment violation was not the "but-for" cause of obtaining the drugs which were found in the vehicle. The precedent set by *Peralez* seems to have sounded the death knell for most potential Fourth Amendment claims in which the Trooper has a dog in his patrol car at the beginning of the traffic stop.

either was not given his *Miranda* warnings, or that the statements he gave after the *Miranda* warnings were given were involuntary because of the language barrier.

The government does not dispute that Salazar was in custody during Harvison's interview. Special Agent Harvison and Agent Piercy interviewed Mr. Salazar for approximately three minutes before they advised Mr. Salazar of this *Miranda* rights. "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Salazar's statements during the initial three minute time-frame, therefore, should be suppressed.

> Because *Miranda* warnings may inhibit persons from giving information, this Court has determined that they need be administered only after the person is taken into custody or his freedom has otherwise been significantly restrained. Unfortunately, the task of defining custody is a slippery one, and policemen investigating serious crimes cannot realistically be expected to make no errors whatsoever. If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985) (internal punctuation and citations omitted). "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded the admission of the earlier statement." *Id.*, 470 U.S. at 313, 105 S.Ct. at 1296. Mr. Salazar offered no evidence that his unwarned statement was obtained through actual coercion. No evidence of strong-arm tactics, deception, or other coercive strategies was presented. The Eighth Circuit has declined on at least one occasion to apply the *Oregon v. Elstad* doctrine to *Mirandized*

statements given "on the heels" of non-*Mirandized* statements.[12] *See United States v. Carter*, 884 F.2d 368, 373 (8th Cir. 1989). It has applied the doctrine, however, in other cases where the first non-*Mirandized* statements were made in the absence of coercion or improper police tactics. *See, United States v. Robinson*, 20 F.3d 320, 322 (8th Cir. 1994); *United States v. Williams*, 136 F.3d 547, 552 (8th Cir. 1998). The facts of this case are much more similar to *Robinson* and *Williams* than to *Carter*. Specifically, in *Carter*, the unwarned statement was given, and consent to search was obtained, through coercive and deceptive police tactics. "Our review of the surrounding circumstances and the entire course of police conduct with respect to the suspect convinces us that the second confession cannot be allowed into evidence." *Carter*, 884 F.2d at 373. In *Robinson* and *Williams*, on the other hand, the Court found no coercion or improper tactics (other than the failure to administer the warning) prior to the unwarned statements. Likewise, the only error the Defendant has shown here is Agent Harvison's failure to give the warning prior to eliciting a few non-incriminating answers. Such failure, while not commendable, is not the sort of coercive or diabolical tactic which renders a subsequent voluntary, warned statement inadmissible.

Next, Mr. Salazar asserts he did not knowingly waive his rights because he did not sufficiently understand his rights because of the language barrier. Agent Harvison testified he read the *Miranda* warning to Salazar in English. When Salazar indicated only partial understanding, Harvison asked Salazar if he could read Spanish, and Salazar said he could. Harvison produced a Spanish language *Miranda* card, which Salazar read and indicated he understood.[13] After Mr. Salazar read his *Miranda* rights in Spanish, he continued the interview with Harvison (in English).

In considering whether a defendant has knowingly and intelligently waived his Miranda rights, the Court considers, as one factor, any language difficulties encountered by the defendant

---

[12]This was likewise not a purposeful "midstream" *Miranda* warning tactic, as was condemned in *Missouri v. Seibert*, 124 S.Ct. 2601 (2004). While Agent Harvison asked Mr. Salazar a few basic questions on February 21, he did not delve into the heart of the issue (the drug charges) until after the *Miranda* warning was given, and no incriminating information was obtained before the warning.

[13]The parties stipulated during the hearing that Harvison's Spanish language *Miranda* card accurately translates the *Miranda* warning into the Spanish language.

14

during the custodial interrogation. *United States v. Garibay,* 143 F.3d 534, 537 (9th Cir. 1998). However, "a defendant's ignorance of the full consequences of his decisions [does not] vitiate their voluntariness." *Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985).

Additionally, Agent Harvison testified Mr. Salazar indicated, through his actions and words, that he understood the *Miranda* warnings. He specifically stated he understood and agreed to speak with Agent Harvison, continued to converse with him, and answered Agent Harvison's questions in a coherent manner. It is difficult to imagine how Mr. Salazar could converse with Agent Harvison and answer his questions if he did not understand what Agent Harvison was saying to him. Having listened to the interview, it is clear English is not Mr. Salazar's first language. It is also clear, however, that he understood Harvison's questions and answered them appropriately. Given Harvison's un-rebutted testimony and the parties' stipulation that the Spanish version of the *Miranda* warning was accurate, the Government has proven by a preponderance that Mr. Salazar knowingly and voluntarily waived his Fifth Amendment rights when he spoke to Agent Harvison. *See e.g., Perri v. Illinois Dept. of Corrections,* 817 F.2d 448, 452 (7th Cir. 1987) (knowing and intelligent waiver when non-English speaking defendant responded that he understood, and his words and actions supported conclusion that he waived his rights); *United States v. Gonzales,* 749 F.2d 1329, 1335-36 (9th Cir. 1984) (defendant knowingly and voluntarily waived rights despite Spanish/English language barrier because among other things, the agent and defendant continued to converse with each other after rights were read); *Garcia v. Yearwood,* 2000 WL 890863 (N.D. Cal.) (defendant knowingly and voluntarily waived rights; court rejected his claim they were "somewhat difficult" to understand even though read to him in his native Spanish language, because the record showed defendant had coherent conversations with the interrogating officer). For these reasons, with the exception of the first three non-*Mirandized* minutes, Mr. Salazar's conversation with Agent Harvison should not be suppressed.

## CONCLUSION

For the reasons more fully explained above, it is respectfully RECOMMENDED to the District Court that the Defendant Salazar's Motion to Suppress (Doc. 38) be GRANTED in part and DENIED in part as follows: the motion to suppress evidence should be DENIED in its entirety

and the motion to suppress statements should be GRANTED as to those statements which were made to Agent Harvison before the *Miranda* warnings were given but DENIED as to post-Miranda statements. Defendant Carrasco's Motion (Doc. 70) should be DENIED.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this __8__ day of August, 2008.

BY THE COURT:

John E. Simko
United States Magistrate Judge